## VALDES *v.* CENTRAL ALTAGRACIA, INCORPORATED.

## CENTRAL ALTAGRACIA *v.* VALDES.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES
FOR PORTO RICO.

Nos. 193, 196.   Submitted March 6, 1912.—Decided May 13, 1912.

The record in this case shows that the court below did not err in bringing this case to a speedy conclusion and avoiding the loss occasioned by the litigation to all concerned.

A litigant cannot, after all parties have acquiesced in the order setting the case for trial and the court has denied his request for continuance, refuse to proceed with the trial on the ground that the time to plead has not expired, and when such refusal to proceed is inconsistent with his prior attitude in the case.

The granting of a continuance is within the sound discretion of the trial court, and not subject to be reviewed on appeal except in cases of clear error and abuse; in this case the record shows that the refusal to continue on account of absence of witness was not an abuse, but a just exercise, of discretion.

Under the circumstances of this case, and in view of the existence of an equity of redemption under prior transfers, *held*, that a transfer of all the property of a corporation to one advancing money to enable it to continue its business was not a conditional sale of the property but a contract creating security for the money advanced, and on liquidation of the assets the transferee stood merely as a secured creditor.

The mere form of an instrument transferring property of a debtor cannot exclude the power of creditors to inquire into the reality and substance of a contract unrecorded although required by law to be recorded in order to be effective against third parties.

Under the general law of Porto Rico, machinery placed on property by a tenant does not become immobilized; when, however, a tenant places it there pursuant to contract that it shall belong to the owner, it becomes immobilized as to that tenant and his assigns with notice, although it does not become so as to creditors not having legal notice of the lease.

In this case, *held* that the lien of the attachment of a creditor of the tenant on machinery placed by the tenant on a sugar Central in Porto Rico is superior to the claim of the transferee of an unrecorded

lease, even though the lease required the tenant to place the machinery on the property.

5 Porto Rico. Fed. Rep. 155, affirmed.

THE facts are stated in the opinion.

*Mr. F. Kingsbury Curtis, Mr. Hugo Kohlmann* and *Mr. Martin Travieso, Jr.,* for Valdes, appellant in No. 193 and appellee in No. 196.

*Mr. N. B. K. Pettingill* and *Mr. Frederick L. Cornwell,* for Central Altagracia, appellee in No. 193 and appellant in No. 196.

*Mr. Francis H. Dexter* for Nevers & Callaghan.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

These cases were consolidated below, tried together, a like statement of facts was made applicable to both and the court disposed of them in one opinion. We shall do likewise. Stating only things deemed to be essential. as shown by the pleadings and documents annexed to them and the finding of facts made below, the case is this: Joaquin Sanchez owned in Porto Rico a tract of land of about twenty-two acres (cuerdas) on which was a sugar house containing a mill for crushing cane and an evaporating apparatus for manufacturing the juice of the cane. into sugar. All of the machinery was antiquated and of a limited capacity. The establishment was known as the Central Altagracia, and Sanchez, while not a cane grower, carried on the business of a Central—that is, of acquiring cane grown by others and manufacturing it into sugar at his factory. On the eighteenth day of January, 1905, Sanchez leased his land and plant to Salvador Castello for a period of ten years. The lease gave to the tenant (Castello), the right to install in the plant "such machinery as he may deem convenient, which said machinery, at the end

of the years mentioned (the term of the lease) shall become the exclusive property" of the lessor, Sanchez. The tenant was given one year in which to begin the work of repairing and improving the plant, and it was provided that "upon the expiration of this term, if the necessary improvements shall not have been begun by him (Castello), then this contract shall be null and void, and no cause of action shall accrue to any of the contracting parties by reason thereof." Further agreeing on the subject of the improved machinery which was to be placed in the plant, the contract provided: "Upon the expiration of the term agreed on under this contract, any improvement or machinery installed in the said Central shall remain for the benefit of Don Joaquin Sanchez and Don Salvador Castello shall have no right to claim anything for the improvements made." The rental was thus provided for: "After each crop such profits as may be produced by the Central Altagracia shall be distributed and twenty-five per cent. (25%) thereof shall be immediately paid to Don Joaquin Sanchez as equivalent for the rental of said Central and of the twenty-two (22) cuerdas of land surrounding the same. The remaining seventy-five per cent. (75%) shall belong to Don Salvador Castello, who may interest therein whomsoever he may wish, either for the whole or part thereof." It was stipulated, however, that in fixing the profits no charge should be made for repairs of the existing machinery or for new machinery put in, as the entire cost of these matters was to be borne by the lessee, Castello. The lease provided, moreover, that in case of the death of Sanchez the obligations of the contract should be binding on his heirs, and in the case of the death of Castello, his brother, Gerardo Castello, should take his place "and be a contracting party if he so desired. Otherwise the plantation, in such a condition as it may be at his death, shall immediately pass into the possession of its owner, Don Joaquin Sanchez." In June,

1905, by a supplementary contract, the lease was extended without change of its terms and conditions for an additional period of ten years, making the total term twenty years. Although executed under private signature, this lease, conformably to the laws of Porto Rico, was produced before a notary and made authentic and in such form was duly registered on the public records, as required by the Porto Rican laws.

On the first day of July, 1905, Salvador and Gerardo Castello transferred all their rights acquired under the lease, as above stated, to Frederick L. Cornwell for "the corporation to be organized under the name of Central Altagracia, of which he is the trustee." This transfer bound the corporation to all the obligations in favor of the original lessor, Sanchez, provided that the corporation should issue to Castello a certain number of paid up shares of its capital stock and a further number of shares as the output of sugar from the plant increased as the result of its enlarged capacity consequent upon the improvement of the machinery by the corporation. The lease further provided for the employment of Castello as superintendent at a salary, for a substitution of Gerardo Castello, in the event of the absence or death of his brother Salvador, and, for this reason, it is to be assumed, Gerardo made himself a party to the transfer of the lease. This transfer of the lease to the corporation was never put upon the public records. The corporation was organized under the laws of the State of Maine and under the transfer took charge of the plant. The season for grinding cane and the manufacture of sugar in Porto Rico usually commences "about the month of December of each year and terminates in the months of May, June or July of the year following, according to the amount of cane to be ground." Central factories in Porto Rico usually "make contracts with the people (colonos) growing cane so that growers of cane will deliver the same to be ground, and such contracts

are usually made and entered into in the months of June, July and August." In other words, on the termination of one grinding season, in the months of June or July, it is usual in the ensuing August to make new contracts for the cane to be delivered in the following grinding season, which, as we have said, commences in December. The contract transferring the lease to the Central Altagracia, incorporated, was made in July, 1905, at the end, there- fore, of the grinding season of that year. To what extent the corporation contracted for cane to be delivered to it for grinding during the season of 1905–6, which began in December, 1905, does not appear. It is inferable, however, that the corporation began the work of installing new machinery to give the plant a larger capacity within the year stipulated in the lease from Sanchez to Castello. We say this because it is certain that in the fall of 1906 (October) the corporation borrowed from the commercial firm of Nevers & Callaghan in New York city the sum of twenty-five thousand dollars ($25,000) to enable the cor- poration to pay for new and enlarged machinery which it had ordered and which was placed in the factory in time to be used in the grinding season of 1906–7, which began in December, 1906. While such grinding season was progressing, on April 11, 1907, the corporation, through its president, under the authority of its board of directors, sold to one Ramon Valdes all its rights acquired under the lease transferred by Castello. This transfer expressly included all the machinery previously placed by the corporation in the sugar house, as well as machinery which might be thereafter installed during the term of redemption hereafter to be referred to and which, it was declared, conformably to the original lease "shall be a part of said factory for the manufacture of sugar." The consideration for the sale was stated in the contract to be "thirty-five thousand dollars ($35,000) received by the corporation, twenty-five thousand four hundred dol-

lars ($25,400) whereof had been paid prior to this act (of sale) and to its entire satisfaction, and the balance of nine thousand six hundred dollars ($9,600) shall be turned over to the vendor corporation by Senor Valdes immediately upon being required to do so by the former." This sale was made subject to a right to redeem the property within a year on paying Valdes the entire amount of his debt. There was a stipulation that Valdes assumed all the obligations of the lease transferred by Castello to the company.

The undoubted purpose was not to interfere with the operation of the plant by the corporation, since there was a provision in the contract binding Valdes to lease the property to the corporation pending the period of redemption. This sale was passed in Porto Rico before a notary public, but was never put upon the public records. At the time it was made there was a very considerable sum unpaid on the debt of Nevers & Callaghan. This fact, joined with the period when the sale with the right to redeem was made, that is, the approaching end of the sugar-making season of 1906 and 1907, coupled with other facts to which we shall hereafter make reference, all tend to establish that at that time, either because insufficient capital had been put into the venture or because the business had been carried on at a loss, the affairs of the corporation were embarrassed, if it was not insolvent. A short while before the commencement of the grinding season of 1907–1908, in October, 1907, in the city of New York, the corporation, through its president, declaring himself to be authorized by the board of directors, sanctioned by a vote of the stockholders, apparently made an absolute sale of all the rights of the corporation under the lease and all its title to the machinery which the corporation had put into the plant. This sale was declared to be for a consideration of sixty-five thousand ($65,000) dollars which the company acknowledged to have received from Valdes, first, by the payment of the thirty-

five thousand dollars cash, as stated in the previous sale made, subject to the equity of redemption, and thirty thousand ($30,000) dollars which "the company has received afterwards in cash from Valdes." There was a provision in the contract to the effect that as the purpose of the previous contract of sale, which had been made subject to the equity of redemption, was accomplished by the new sale, the previous sale was declared to be no longer operative.

A few days afterwards, likewise in the city of New York (on November 2, 1907), Valdes sold to the company all the rights which he had acquired from it by the previous sale, the price being sixty-five thousand ($65,000) dollars, payable in installments falling due in the years 1908, 1909, 1910 and 1911 respectively. This transfer was put in the form of a conditional sale which reserved the title in Valdes until the payment of the deferred price and upon the stipulation that any default by the corporation entitled Valdes *ipso facto* to take possession of the property. Neither this act of sale from Valdes to the corporation nor the one made by the corporation to Valdes were ever put upon the public records.

Prior to the making of the sales just stated, or about that time, the corporation defaulted in the payment of a note held by Nevers & Callaghan for a portion of the money which they had loaned the corporation under the circumstances which we have previously stated, and that firm sued in the court below the corporation to recover the debt.

The grinding season of 1907-1908 commenced in December, 1907, and was obviously not a successful one, for the debt of Nevers & Callaghan was not paid, and in May, 1908, a judgment was recovered by them against the corporation for about seventeen thousand dollars with interest, and in the same month execution was issued and levied upon the machinery in the sugar house. Previous to or not long subsequent to the time Nevers & Cal-

laghan commenced their suit, the precise date not being stated in the record, the heirs of Sanchez, the original lessor, brought a suit in the court below against the corporation. The nature of the suit and the relief sought is not disclosed, but it is inferable from the facts stated that the suit either sought to recover the property on the ground that there was no power in Castello to transfer the lease, or upon the ground of default in the conditions as to payment of profits as rental which the lease stipulated. It would seem also at about the same time either one or both of the Castellos brought a suit against the company, presumably upon the theory that there had been a default in the obligations assumed in their favor by the corporation at the time it took the transfer of the lease. In the meanwhile also, probably as the result of the want of success of the corporation, discord arose between its stockholders and a suit growing out of that state of things was brought in the lower court.

This litigation was commenced in June, 1908, by the bringing by Valdes of an action at law in the court below to recover the plant on the ground that by the default in paying one of the installments of the price stated in the conditional sale, the right to the relief prayed had arisen. On the same day Valdes commenced a suit in equity against the corporation in aid of the suit at law. The bill alleged the default of the corporation, the bringing of the suit at law, the confusion in the affairs of the corporation, the judgment and levy of the execution by Nevers & Callaghan, and the threat to sell the machinery under such execution; the refusal of the corporation to deliver possession of the property, the waste and destruction of the value of the property which would result if there was no one representing the corporation having power to contract for cane to be delivered during the next grinding season, etc., etc. The prayer was for the appointment of a receiver to take charge of the property with au-

thority to carry on the same, make the necessary contracts
for cane for the future, it being prayed that the receiver
should be empowered to issue receiver's certificates to the
extent necessary to the accomplishment of the purposes
which the bill had in view.

On the same day a bill was filed on behalf of the corpora-
tion against Valdes. This bill attacked the sale made to
Valdes and by him to the corporation. It was charged
that the price stated to have been paid by Valdes as a
consideration of the conditional sale was fictitious, and
that the only sum he had advanced at that time was
the thirty-five thousand dollars which it was the purpose
to secure by means of the sale with the equity of redemp-
tion. That at that time Valdes exacted as a considera-
tion for his loan that he be made a director and vice-
president of the company. The bill then stated that it
having become evident in the following autumn that the
corporation would require more money to increase its
plant, to pay off the sum due Nevers & Callaghan, and
for the operation of the plant, Valdes agreed to advance
the money if he were made president of the company at a
stipulated salary, given a bonus in the stock of the com-
pany and upon the condition that the papers be executed
embodying the so-called sale of the company to Valdes
and the practically simultaneous conditional sale by
Valdes to the company. The bill then alleged that Valdes,
having thus become the president of the company, failed
to carry out his agreement to advance the money, failed to
provide for the debt of Nevers & Callaghan, mismanaged
the affairs of the property in many alleged particulars,
and did various acts to the prejudice of the company and
to his own wrongful enrichment, which it is unnecessary
to recapitulate. The necessity of contracting for cane
during the contract season, in order that the plant might
continue during the next operating season to be a going
concern and the waste and loss which would otherwise

be occasioned, were fully alleged. Valdes and the firm of Nevers & Callaghan and the individual members of that firm were made defendants. The prayer was for the appointment of a receiver and with power to carry on the business of the Central, with power for that purpose to contract for cane for the coming season, with authority to issue receiver's certificates for the purpose of borrowing the money which might be required.

The judge being about to leave Porto Rico for a brief period, declined to appoint a permanent receiver, but named a temporary one to keep the property together until a further hearing could be had, interference in the meanwhile with the custodian being enjoined. Shortly thereafter creditors of the corporation intervened and joined in the prayer made by both of the complainants for the appointment of a receiver. In July the two suits were by order consolidated and after a hearing a receiver was appointed and authority given him to continue the property as a going concern and to borrow a limited amount of money on receiver's certificates if necessary to secure contracts for cane for the coming crop season. The execution of the Nevers & Callaghan judgment was stayed pending an appeal which had been taken to this court. The only difference which seems to have arisen concerning the appointment of the receiver grew out of the fact that a prayer of the Central Altagracia, asking the court to appoint as receiver Mr. Pettingill, a member of the bar and one of the counsel of the corporation, and who was also its treasurer, was denied. Despite this, the fair inference is that the ultimate action of the court was not objected to by anyone, because of the hope that the result of a successful operation of the plant during the coming crop season might ameliorate the affairs of the corporation and thus prevent further controversies. We say this, not only because of the conduct of the parties prior to the order appointing the receiver, but because

after that order the solicitors of the Altagracia Company and Valdes put a stipulation of record that until the following October no steps whatever should be taken in the proceedings, and not even then unless the attorneys for both parties should be in Porto Rico.

The hope of a beneficial result from the operation of the plant by the receiver proved delusive. As a result of such operation there was a considerable loss represented by outstanding receiver's certificates, with no means of paying except out of the property. Obviously, for this reason, the record contains a statement that on July 12, 1909, a conference was had between the court and all parties concerned to determine what steps should be taken to meet the situation. It appears that at that conference the counsel representing the heirs of Sanchez and of Nevers & Callaghan stated their opposition to a continuance of the receivership.

On July 17, 1909, the court placed a memorandum on the files indicating its purpose to bring the litigation, receivership, etc., to an end and to cause "immediate issue to be raised on the pleadings for that purpose." This memorandum was entitled in all the pending causes concerning the property. It directed that demurrers which had been filed in the consolidated cause of Valdes against the corporation and of the corporation against Valdes be overruled, and the defendants were required to answer on or before Monday, July 26, in order that upon the following day, the twenty-seventh of July, the issues raised might be tried before the court without the intervention of a master. It was provided in the order, however, that nothing in this direction should prevent the parties from filing such additional pleadings as it is deemed necessary for the protection of their rights by way of cross bill or amendment, etc. To make the order efficacious it was declared that nothing would be done in the suit of the heirs of Sanchez against Castello and the Altagracia

which was pending on appeal, and that a demurrer filed
to the suit of Castello against the Central would be over-
ruled; that the demurrer in the suit at law of Valdes would
remain in abeyance to await the final action of the court
on the trial of all the issues in the equity causes and that
a stay of the Nevers & Callaghan execution would be also
disposed of when the equity cases came to be decided.
This order was followed by a memorandum opinion filed
on July the 21st stating very fully the position of the
respective suits, the necessity for action in order to pre-
serve the property from waste and reiterating the view
that whatever might be the rights of the Central Alta-
gracia or of Valdes under the lease, those rights would
be subordinate to the ultimate determination of the suit
brought by the heirs of Sanchez. To the action of the
court, as above stated, no objection appears to have been
made. On the contrary, between the time of that order
and the period fixed for the commencement of a hearing
the Central Altagracia, Valdes and Nevers & Callaghan
modified their pleadings to the extent deemed by them
necessary to present for trial the issues upon which they
relied. In the case of the Central Altagracia this was
done by filing on July 22 an amended bill of complaint
in its suit against Valdes and on July 26 its answer in the
suit of Valdes. The acceptance by Valdes of the terms of
the order was shown by an answer filed to the bill in the
suit of the company and the cross bill in the same cause;
and Nevers & Callaghan manifested their acquiescence
by obtaining leave to make themselves parties and assert-
ing their rights by cross bill and answers, which it is un-
necessary to detail.

When the consolidated cause was called for trial on the
morning of July 27, the counsel for the Central Altagracia
moved a continuance in order to take the testimony of
certain witnesses in Philadelphia and New York for the
purpose of proving some of the allegations of the complaint

as to the wrongdoing of Valdes in administering the affairs of the corporation. This application was supported by the affidavit of Mr. Pettingill, the counsel of the corporation. The record states that the request for continuance was opposed by all the other counsel, and the application was denied. In doing so the court stated "that the matter has been pending for more than a year and that counsel had full notice of the court's intention to press the matter to issue and trial and that it is not disposed to delay matters at this time when the admissions of the pleadings are so broad that the proofs available here in Porto Rico are probably sufficient and the amended complaint already on file in suit No. 565—*Valdes* v. *The Altagracia Company*—and the answer thereto and the answer recently filed in suit No. 564—*Altagracia Company* v. *Valdes*—as well as the cross bill also recently filed in suit No. 465 makes so many allegations and admissions as that the real issue between the parties can be plainly seen and that, in the opinion of the court, enough proof is available here in Porto Rico." The court thereupon declared that the Altagracia Company might by the next day, if it so desired, file exceptions to the answer in suit 565 and an answer to the cross complaint, indeed—that the corporation might, if it wished, treat them as filed and proceed with the cause and file them at any convenient time thereafter. Thereupon the record states: "Said counsel for the Central Altagracia stated that he desired time to file exceptions to the answer and an answer to the cross bill in suit No. 565; and the court granted until the morning of July 28 for such purpose. Later in the day of July 27, one of the counsel for Valdes having requested the court to postpone the hearing of the cause until the morning of the 29th, because of an unexpected professional engagement elsewhere, the request was communicated by the court to the other counsel in the cause. Thereupon the record again recites, "Messrs. Pettingill &

Cornwell, attorneys for the Central Altagracia, stated that they withdrew any statement they have hitherto made in the cause in that regard and desired to be understood that they would not except to the answer in suit No. 565 or plead or answer to the cross bill therein save and except within the time which they contended the rules governing this court of equity gave them and would stand upon what they considered their rights in that regard." When the court assembled the next day, on the morning of the 28th, a statement concerning the occurrence of the previous day as to the continuance, etc., just reviewed, was read by the court in the presence of all the counsel, whereupon the record recites, "N. B. Pettingill, counsel for the Central Altagracia, in response to the same stated that he objected to proceeding to take any evidence in any of the causes at that time or the testimony of any witnesses because the same was not at issue or in condition for the taking of evidence and objected to the taking of such evidence until the issues of said causes are made up in accordance with the rules of practice applicable to equity causes." The record further recites, "which objection was overruled by the court on the ground that the action called for thereby is not necessary. That the bill was amended within three days; an answer was immediately filed to it and a cross bill also filed, the said cross bill making only the same claims as were made in suit No. 563 at law, and that any way the issue could be tried on the bill and answer in both suits. . . ." This ruling of the court having been excepted to the trial proceeded from day to day, the counsel for the Central Altagracia taking no part in the same and virtually treating the proceedings as though they did not concern that corporation.

In substance, the court decided: First, that as the result of the contracts between Valdes and the Central Altagracia, he was not the owner of the rights of that corporation under the lease, or of the machinery which

had been placed in the sugar house by the Altagracia Company or of the other assets of the corporation, but that he was merely a secured creditor. The sum of the secured debt was fixed after making allowances for some not very material credits which the corporation was held to be entitled to. Second, that the judgment in favor of Nevers & Callaghan was valid and that that firm by virtue of its execution and levy upon the machinery had a prior right to Valdes. Third, the sums due to various creditors of the corporation were fixed and the equities or priorities were classified as follows: *a.* Taxes due by the corporation and the sum of the receiver's certificates and certain costs; *b.* The judgment of Nevers & Callaghan, and *c.* The debt of Valdes; *d.* Debts due the other creditors. Without going into details it suffices to say that for the purpose of enforcing these conclusions the decree directed a sale of all the rights of the Central Altagracia in and to the lease, machinery, contract, etc., and imposed the duty upon Valdes, if he became the purchaser, to pay enough cash to discharge the costs, taxes, receiver's certificates and the claim of Nevers & Callaghan.

These appeals were then prosecuted, the one by the Central Altagracia and the other by Valdes. We shall endeavor as briefly as may be to dispose of the contentions relied upon to secure a reversal.

I. *The Central Altagracia Appeal.*—The alleged errors insisted on in behalf of that company relate to the asserted arbitrary action of the court in forcing the cause to trial without affording the time which it is insisted the corporation was entitled to under the equity rules applicable to the subject, and, second, the refusal of the court to grant a continuance upon the affidavit as to the absence of material witnesses.

We think all the contentions on this subject are demonstrated to be devoid of merit by the statement of the case which we have made. In the first place, it is mani-

fest from that statement that the proceeding leading up to the appointment of a receiver and the power given to administer the property was largely the result of the assent of the corporation. In the second place, when the unsuccessful financial issue of the receivership had become manifest we think the statement makes it perfectly clear that the steps taken by the court for the purpose of bringing the case to a speedy conclusion, and thus avoiding the further loss which would result to all interests concerned, were also acquiesced in by all the parties in interest who complied with the terms of that order and took advantage of the rights which it conferred. We think also the statement makes it apparent that the refusal on the part of the corporation to proceed with the trial, upon the theory that the time to plead allowed by the equity rules had not elapsed, was the result of a change of view because of the action of the court in refusing the continuance on account of the absent witnesses—a change of front which was inconsistent with the rights which the corporation had exercised in accord with the order setting the cause for trial and with the rights of all the other parties to the cause which had arisen from that order and from the virtual approval of it, or at least acquiescence in it, by all concerned.

Considering the assignments of error in so far as they relate alone to overruling of the application for continuance based upon the absence of witnesses, it suffices to say that the elementary rule is that the granting of a continuance of the cause was peculiarly within the sound discretion of the court below, a discretion not subject to be reviewed on appeal except in case of such clear error as to amount to a plain abuse springing from an arbitrary exercise of power. Instead of coming within this latter category, we think the facts as to the refusal to continue and the conduct of the parties make it clear that there was not only no abuse but a just exercise of discretion.

II. *As to the Appeal of Valdes.*—Two propositions are relied upon, first that error was committed in treating Valdes merely as a secured creditor, and in not holding him to be the absolute owner of the rights and property alleged to have been transferred by the so-called conditional sale. Second. That in any event error was committed in awarding to Nevers & Callaghan priority over Valdes.

The first proposition is supported by a reference to the Porto Rican Code and decisions of the Supreme Court of Spain and the opinions of Spanish law writers. But the contention is not relevant, and the authorities cited to sustain it are inapposite to the case to be here decided, because the argument rests upon an imaginary premise, that is, that the ruling of the court below denied the right under the Spanish law to make a conditional sale or held that such a sale if made would not have the effect which the argument insists it was entitled to. This is true because the action of the court was solely based upon a premise of fact, viz., that under the circumstances of the case and in view of the prior sale with the equity of redemption, the cancellation of that sale and the transfer made by the corporation to Valdes and the immediate transfer of the same rights by him to the corporation in the form of a conditional sale, the failure to register any of the contracts, and the relation of Valdes to the corporation at the time the contracts were made it resulted that whatever might be the mere form, in substance and effect no conditional sale was made but a mere contract was entered into which the parties intended to be a mere security to Valdes for money advanced and to be advanced by him. This being the case it is manifest that it is wholly irrelevant to argue that error was committed in not applying the assumed principles of the Porto Rican and Spanish law governing in the case of a conditional sale, when the ruling which the court made proceeded upon the conclusion that there was no conditional sale.

The contention that under the Porto Rican law the form was controlling because proof of the substance was not admissible seems not to have been raised below, but, if it had been is obviously without merit, as the case as presented involved not a controversy alone between the parties to the contract, but the effect and operation of the contract upon third parties, the creditors of the corporation. The contention is additionally without merit, since it assumes that the mere form of the contract excluded the power of creditors to inquire into its reality and substance even although the contract was never inscribed upon the public records so as to bind third parties. That its character was such as to require inscription we shall in a few moments demonstrate in coming to consider the second proposition, that is, upon the hypothesis that Valdes was but a secured creditor, was error committed in subordinating his claim to the prior claim of Nevers & Callaghan under their judgment and execution.

To determine this question involves fixing the nature and character of the property from the point of view of the rights of Valdes and its nature and character from the point of view of Nevers & Callaghan as a judgment creditor of the Altagracia Company and the rights derived by them from the execution levied on the machinery placed by the corporation in the plant. Following the Code Napoleon, the Porto Rican Code treats as immovable (real) property, not only land and buildings, but also attributes immovability in some cases to property of a movable nature, that is, personal property, because of the destination to which it is applied. "Things," says § 334 of the Porto Rican Code, "may be immovable either by their own nature or by their destination or the object to which they are applicable." Numerous illustrations are given in the fifth subdivision of section 335, which is as follows: "Machinery, vessels, instruments or

implements intended by the owner of the tenements for the industry or works that they may carry on in any building or upon any land and which tend directly to meet the needs of the said industry or works." See also Code Nap., articles 516, 518 *et seq.* to and inclusive of article 534, recapitulating the things which, though in themselves movable, may be immobilized. So far as the subject-matter with which we are dealing—machinery placed in the plant—it is plain, both under the provisions of the Porto Rican law and of the Code Napoleon, that machinery which is movable in its nature only becomes immobilized when placed in a plant by the owner of the property or plant. Such result would not be accomplished, therefore, by the placing of machinery in a plant by a tenant or a usufructuary or any person having only a temporary right. Demolombe, Tit. 9, No. 203; Aubry et Rau, Tit. 2, p. 12, § 164; Laurent, Tit. 5, No. 447; and decisions quoted in Fuzier-Herman ed. Code Napoleon under articles 522 *et seq.* The distinction rests, as pointed out by Demolombe, upon the fact that one only having a temporary right to the possession or enjoyment of property is not presumed by the law to have applied movable property belonging to him so as to deprive him of it by causing it by an act of immobilization to become the property of another. It follows that abstractly speaking the machinery put by the Altagracia Company in the plant belonging to Sanchez did not lose its character of movable property and become immovable by destination. But in the concrete immobilization took place because of the express provisions of the lease under which the Altagracia held, since the lease in substance required the putting in of improved machinery, deprived the tenant of any right to charge against the lessor the cost of such machinery, and it was expressly stipulated that the machinery so put in should become a part of the plant belonging to the owner without compensation to the lessee.

Under such conditions the tenant in putting in the machinery was acting but as the agent of the owner in compliance with the obligations resting upon him, and the immobilization of the machinery which resulted arose in legal effect from the act of the owner in giving by contract a permanent destination to the machinery. It is true, says Aubry and Rau, vol. 2, § 164, par. 2, p. 12, that "The immobilization with which the article is concerned can only arise from an act of the owner himself or his representative. Hence the objects which are dedicated to the use of a piece of land or a building by a lessee cannot be considered as having become immovable by destination except in the case where they have been applied for account of the proprietor or in execution of an obligation imposed by the lease." It follows that the machinery placed by the corporation in the plant, by the fact of its being so placed lost its character as a movable and became united with and a part of the plant as an immovable by destination. It also follows that as to Valdes, who claimed under the lease, and who had expressly assumed the obligations of the lease, the machinery for all the purposes of the exercise of his rights, was but a part of the real estate, a conclusion which cannot be avoided without saying that Valdes could at one and the same time assert the existence in himself of rights and yet repudiate the obligations resulting from the rights thus asserted.

Nevers and Callaghan were creditors of the corporation. They were not parties to nor had they legal notice of the lease and its conditions from which alone it arose that machinery put in the premises by the Altagracia became immovable property. The want of notice arose from the failure to record the transfer from Castello to the Altagracia or from the Altagracia to Valdes, and from Valdes apparently conditionally back to the corporation, a clear result of § 613 of the Civil Code of Porto Rico, providing, "The titles of ownership or of other real rights relating

to immovables which are not properly inscribed or anno-
tated in the registry of property, shall not be prejudicial
to third persons." It is not disputable that the duty to
inscribe the lease by necessary implication resulted from
the general provisions of article 2 of the mortgage law of
Porto Rico, as stated in paragraphs 1, 2 and 3 thereof, and
explicitly also arose from the express requirement of para-
graph 6 relating to the registry of "contracts for the lease
of real property for a period exceeding six years  .  .  ."
It is true that in a strict sense the contracts between Cas-
tello and the Altagracia Company and with Valdes were
not contracts of lease but for the transfer of a contract
of that character. But such a transfer was clearly a con-
tract concerning real rights to immovable property within
the purview of art. 613 of the Civil Code just previously
quoted. Especially is this the case in view of the stipula-
tions of the lease as to the immobilization of movable
property placed in the plant and the other obligations
imposed upon the lessee. "The sale which a lessee makes
to a third person to whom he transfers his right of lease
is the sale of an immovable right and not simply a sale
of a movable one." See numerous decisions of the courts
of France, beginning with the decision on February 2,
1842, of the Court of Cassation [Journal du Palais (1842),
vol. 1, 171]. See also numerous authorities collected un-
der the heading above stated in paragraph 21, under ar-
ticles 516, 517 and 518 of the Code Napoleon. Fuzier-
Herman ed. of that Code, p. 643.

The machinery levied upon by Nevers & Callaghan,
that is, that which was placed in the plant by the Alta-
gracia Company, being, as regards Nevers & Callaghan,
movable property, it follows that they had the right to
levy on it under the execution upon the judgment in their
favor, and the exercise of that right did not in a legal
sense conflict with the claim of Valdes, since as to him
the property was a part of the realty which, as the result

of his obligations under the lease, he could not, for the purpose of collecting his debt, proceed separately against.

As a matter of precaution we say that nothing we have said affects the rights whatever they may be of the heirs of Sanchez, the original lessor.

*Affirmed.*